

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-2311

CHRISTIAN ARROYO, *et al.*,

*Plaintiffs-Appellees*,

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 4912—**Amy St. Eve**, *Judge*.

ARGUED JANUARY 6, 2011—DECIDED SEPTEMBER 1, 2011

Before EASTERBROOK, *Chief Judge*, and CUDAHY and
POSNER, *Circuit Judges*.

CUDAHY, *Circuit Judge*. Christian Arroyo contracted a
bacterial infection from his mother during his birth. The
physicians involved in Christian's delivery and post-
delivery care failed to diagnose and treat this infection
in a timely manner, which caused the newborn to suffer
severe brain injuries. Several years later, Christian's
parents filed suit against the United States under the

Federal Tort Claims Act. The district court found the United States liable for Christian's injuries, rejecting the United States' claim that the Arroyos' claims were untimely. We affirm.

## I. Background

In 2002, Maria Solorzano Arroyo and Carlos Arroyo conceived a child (collectively referred to as the Arroyos). During the course of Solorzano Arroyo's pregnancy, she received low cost medical care at the Erie Family Health Center, Inc. (Erie Center), a health clinic that received federal funds for the purpose of treating low income, underinsured individuals. The Erie Center's doctors did not detect any problems with Solorzano Arroyo's pregnancy when providing her with prenatal care and forecasted her due date for June 12, 2003.

On May 16, 2003, Solorzano Arroyo went into labor. She went to Northwestern Memorial Hospital and gave birth to her son, Christian Arroyo in the early morning hours of May 17, 2003. Because Christian's birth was more than a month premature, Solorzano Arroyo had not undergone the battery of diagnostic tests, including a test for Group B Streptococcus (GBS), that women typically undergo in the month prior to delivery. These diagnostic tests are extremely important, as they indicate whether an infant will be at risk of contracting any diseases from his or her mother's blood during birth and allow health care practitioners to take steps to reduce the risks that such incidents will harm the infant.

When a mother has not had these diagnostic tests, medical professionals protect infants by utilizing a two-pronged approach. First, at the delivery stage, doctors are required to observe the presence or absence of four risk factors. Second, after the baby is born, doctors are required to be vigilant in looking for signs indicating the presence or absence of neonatal sepsis (a bacterial infection of the baby's bloodstream). If a medical professional finds any indications of infection, then she must immediately administer antibiotics to prevent the spread of infection. Because GBS is fairly benign in adults, mothers can carry it asymptomatically during pregnancy. Newborns can contract the disease during birth and, unless it is treated immediately, it can cause severe and permanent brain injuries.

Shortly after birth, Christian exhibited several symptoms indicating that exposure to his mother's blood had infected him with GBS. However, the obstetrician, Rahda B. Reddy, M.D. (Dr. Reddy), and pediatrician, Verlainna Callentine, M.D. (Dr. Callentine), responsible for taking care of Solorzano Arroyo failed to detect the infection and treat Christian with antibiotics. Because of this failure, Christian suffered severe and permanent brain injuries. If the doctors had promptly treated Christian, it is likely that the damage done to Christian's brain would have been significantly reduced.

On July 11, 2003, Christian was discharged from Northwestern Memorial hospital. At the time of discharge, doctors informed the Arroyos that Christian had suffered brain injuries and that the injuries were caused

by his exposure to his mother's blood during birth. The Arroyos were not told that Christian's injuries could have been prevented if the GBS infection had been treated at an earlier point in time. As a result of the injuries to his brain, Christian suffers from cerebral palsy, spastic quadriplegia, a seizure disorder, an inability to swallow, a communications deficit, incontinence and permanent pain.

In July of 2004, Christian's mother gave birth to her second son and it was at this time that she first heard about the use of neonatal antibiotics. In approximately October of 2004, the Arroyos saw a lawyer's television commercial that indicated that Christian's injuries could have been caused by his doctors and that they might have grounds for a lawsuit. After seeing this commercial, the Arroyos contacted a law firm and began to investigate the cause of Christian's injuries.

On December 30, 2005, the Arroyos filed a state court lawsuit, naming Drs. Reddy and Callentine as defendants, alleging that both doctors failed to provide proper prenatal care at the Erie Center and during the time surrounding Christian's birth. At the time of Christian's injuries, both Dr. Reddy and Dr. Callentine were affiliated with the Erie Center and were on the Northwestern Memorial Hospital medical staff. The United States Department of Health and Human Services (HHS) has deemed the Erie Center and its employees to be employees of the U.S. Public Health Service, pursuant to the Federally Supported Health Centers Assistance Act, 42 U.S.C. § 233(g)-(n), as amended by the Federally Sup-

ported Health Centers Assistance Act of 1995, Pub. L. No. 104-73. Accordingly, the Federal Tort Claims Act (FTCA) shields the Erie Center's employees, which include Dr. Reddy and Dr. Callentine, from liability while acting within the scope of their duties, with the United States assuming liability for any negligent acts they commit. *See* 42 U.S.C. § 233(g)(1).

On April 19, 2006, while their suit in state court was pending, the Arroyos filed an administrative claim with HHS. *See* 28 U.S.C. § 2675 (requiring a claimant instituting an action against the United States for injury caused by a negligent act or omission of any employee of the Government to first present the claim to the appropriate Federal agency). HHS denied the Arroyos' claim, as well as their subsequent request for reconsideration.

On August 30, 2007, within six months of HHS's final written denial, the Arroyos' state court suit was removed to the Northern District of Illinois and the United States was substituted as the defendant, as required by federal statute. *See* 28 U.S.C. § 2679(d) (requiring a claimant's tort suit against a federal employee to be removed to a federal court in the district and division in which the action was pending as well as requiring the substitution of the United States as the defendant).

In January of 2010, the district court conducted a week-long bench trial. At the conclusion of trial, the court found in favor of the Arroyos. It held that both Drs. Reddy and Callentine negligently failed to recognize and act upon risk factors and signs indicating GBS infection, and as such, caused Christian's injuries by

failing to administer antibiotics. Even though the court found that the government was liable for Christian's injuries, it ordered the parties to file post-trial briefs addressing the issues of damages and the government's statute of limitations defense.

On April 2, 2010, the district court issued a written opinion concluding that the Arroyos' claim was filed within the two year statute of limitations for claims filed pursuant to the FTCA. *See* 28 U.S.C. § 2401(b) (barring a tort claim against the United States unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues). The court awarded the Arroyos over $29 million in damages for various past and future losses and expenses. The government filed a timely appeal from this decision and requests that we reverse the district court's statute of limitation finding.

## II. Analysis

The only part of the district court's decision that the government challenges on appeal is the court's rejection of its statute of limitations defense. The government argues that the district court's decision should be reversed on two grounds: (1) the court failed to apply the proper test for determining when the Arroyos' FTCA claim accrued and (2) several of the court's factual determination were erroneous.

The parties dispute whether the district court's statute of limitations holding constitutes a legal or a factual finding. The district court's finding regarding the gov-

erning claim accrual rule is a legal determination and, as such, is subject to *de novo* review. *See Jones v. General Electric Co.*, 87 F.3d 209, 211 (7th Cir. 1996), *cert. denied*, 519 U.S. 1008 (1996). The district court's determination of the date that the Arroyos knew that Christian's injuries could have been caused by his doctors, or the date that a reasonably diligent person would have discovered the same, constitutes a factual finding. We review such findings for clear error. *See Rush v. Martin Peterson Co.*, 83 F.3d 894, 896 (7th Cir. 1996) (reviewing a finding of actual knowledge for clear error); *Brock v. TIC Intern. Corp.*, 785 F.2d 168, 171 (7th Cir. 1986) (reviewing a "reasonable person" finding for clear error because the date "the statute of limitations beg[ins] to run[] is a question of fact"), *superseded by statute on other grounds*. We have jurisdiction over the government's appeal under 28 U.S.C. § 1291.

## 1.   The FTCA's Statute of Limitations and FTCA Claim Accrual

Given the complexity of the issues raised in this appeal, an extended discussion of our jurisprudence on when FTCA claims accrue and when the FTCA's statute of limitations bars a plaintiff's claims is merited.

The FTCA constitutes a limited waiver of the United States' sovereign immunity and allows individuals to bring an action for damages against the federal government for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his

office or employment." 28 U.S.C. § 1346(b)(1); *Warrum v. United States*, 427 F.3d 1048, 1049 (7th Cir. 2005). The federal government's liability under the FTCA is cabined by the Act's statute of limitations, which bars claims that were not presented in writing to the appropriate agency within two years of the date that the claim accrues. 28 U.S.C. § 2401(b); *Jastremski v. United States*, 737 F.2d 666, 669 (7th Cir. 1984). This two year limitation period is loosened by the Act's savings provision, which states that a plaintiff's claim will be considered timely if: (1) he filed a civil action that contained his claim within two years of his claim's accrual; and (2) he presented his claim to the appropriate federal agency within sixty days of his civil suit's dismissal. *See* 28 U.S.C. § 2679(d)(5).

Federal law governs when a claim accrues under the FTCA, *McCall v. United States,* 310 F.3d 984, 987 (7th Cir. 2002), and we, along with other circuits, have held that a plaintiff's claim accrues when: (A) the plaintiff discovers; or (B) a reasonable person in the plaintiff's position would have discovered that he has been injured by an act or omission attributable to the government. *See Goodhand v. United States*, 40 F.3d 209, 214 (7th Cir. 1994); *Massey v. United States*, 312 F.3d 272, 276, 279 (7th Cir. 2002); *Barnhart v. United States,* 884 F.2d 295, 298 (7th Cir. 1989); *see also McCullough v. United States*, 607 F.3d 1355, 1359 (11th Cir. 2010); *Hughes v. United States,* 263 F.3d 272, 275-76 (3d Cir. 2001). It is worth emphasizing that an individual's FTCA claim accrues only when the individual knows (or should have known) of the "cause that is in the government's control, not a concurrent but independ-

ent cause that would not lead anyone to suspect that the government had been responsible for the injury." *Drazan v. United States*, 762 F.2d 56, 59 (7th Cir. 1985).

Our prior decisions concerning FTCA claims have recognized that there are often multiple causes for a plaintiff's injury. *See, e.g., id.* at 58-59; *Nemmers v. United States*, 795 F.2d 628, 629-32 (7th Cir. 1986). In *Drazan*, we provided the following example of how a single injury can be viewed as the result of multiple causes:

> A postal van knocks a man down, and he strikes his head against the pavement and is killed. No one sees the accident, and the hospital to which the body is taken gives out the cause of death as a fractured skull. That is one cause but the postal service is another; and unless the decedent's survivors know or should have known that the postal service caused the decedent's head to hit the pavement, just knowing that he died from a fractured skull does not start the statute of limitations running.

*Drazan,* 762 F.2d at 59. We have often noted that determining the causes underlying a claimant's injury can be a more complicated task than it initially appears, particularly in the context of medical malpractice claims. *Id.* at 59 (stating that courts must distinguish between plaintiffs' cognizance that they have been harmed and their recognition that they may have been harmed by their doctors). For instance, in *Nemmers*, we decided that a child's cerebral palsy was caused by both the mother's unusually difficult delivery and the actions taken by the health care

practitioners overseeing the delivery. *Nemmers*, 795 F.2d at 629. The plaintiff's knowledge of the former cause was insufficient to cause the statute of limitations to start running on her FTCA claim—accrual only occurred upon her learning that her doctor's actions might also have contributed to her child's injury. *Id.*

There are two final aspects of our FTCA claim accrual jurisprudence that warrant discussion. First, it is worth emphasizing the disjunctive nature of the claim accrual inquiry. An FTCA claim accrues when: (A) an individual actually knows enough to tip them off that a governmental act (or omission) may have caused their injury; *or* (B) a reasonable person in the individual's position would have known enough to prompt a deeper inquiry. Thus, the proper way to determine when the statute of limitations for FTCA claims begins to run is a two-part inquiry that incorporates subjective and objective components. *Id.* at 631. A plaintiff's claim accrues the first time the plaintiff knew, or a reasonably diligent person in the plaintiff's position, reacting to any suspicious circumstances of which he or she might have been aware, would have discovered that an act or omission attributable to the government could have caused his or her injury.

Second, we have held that accrual of an individual's FTCA claim is not postponed until the individual obtains complete knowledge of the cause of his injury. Rather, accrual occurs when an individual acquires information that would prompt a reasonable person to make "a deeper inquiry into a potential [government-related]

cause" of his or her injury. *Id.* at 632. An individual does not need to have reason to believe that the relevant governmental conduct was negligent; mere knowledge of the potential existence of a governmental cause is sufficient to start the clock ticking. *United States v. Kubrick*, 444 U.S. 111, 122 (1979). In other words, the statute of limitations begins to run "either when the government cause is known or when a reasonably diligent person (in the tort claimant's position) reacting to *any suspicious circumstances* of which he might have been aware would have discovered the government cause—whichever comes first." *Drazan,* 762 F.2d at 59 (emphasis added).

## 2. The District Court Applied the Proper Claim Accrual Test

The United States contends that the district court misinterpreted our FTCA claim accrual jurisprudence when deciding whether the Act's statute of limitations barred the Arroyos' claim. Specifically, the government argues that the district court erred by predicating the accrual of the Arroyos' claim on the subjective knowledge of the Arroyos and failing to consider whether the Arroyos' claim accrued at an earlier point in time under the objective, reasonable person inquiry.

We reject the government's argument and find that the district court applied the proper claim accrual rule. As discussed above, a district court deciding when an FTCA claim accrued must conduct a two-part inquiry to determine when the plaintiff knew about "the government cause . . . or when a reasonably diligent person . . .

would have discovered the government cause." *Drazan*, 762 F.2d at 59. It is clear that the district court considered whether the Arroyos had actual knowledge that Christian's injuries were attributable to an act or omission of a government doctor. See 2010 WL 1437925 at *2-9 (N.D. Ill. April 2, 2010) (stating that there was "no evidence that Plaintiffs had actual knowledge that there was iatrogenic harm at the time that the hospital discharged Christian"). It is similarly clear that the district court considered the objective component of the inquiry. *Id*. at *9 ("A reasonable person in the Plaintiffs' position would have had no reason to suspect that something could have prevented Christian's injury.").

### 3. The District Court's Factual Determinations Regarding When the Arroyos' Claim Accrued Were Not Erroneous

The United States contends that, even if the district court considered the correct limitation and accrual rules, we should reverse the court's judgment because its analysis of when Plaintiffs' claims accrued contained several erroneous factual determinations. Reiterating many of the arguments they presented to the district court, the government argues that the Arroyos' claim accrued in the end of June or the beginning of July of 2003, when they were informed by the hospital that Christian had suffered brain injuries due to a bacterial infection that he contracted from exposure to his mother's blood during birth. The government argues that the knowledge that Christian had been injured by an infection

while in the care of the hospital was sufficient to cause their FTCA claim to accrue. If accrual occurred during this period, then the Arroyos' claim would be barred by the FTCA's statute of limitations because their state court suit, filed on December 5, 2005, was not filed within two years of the date of accrual.

The district court rejected the government's assertion that the Arroyos' claim accrued in mid-2003, stating that the government had failed to produce evidence establishing that the Arroyos had reason to believe that Christian's injuries were caused by his doctors or that a reasonable person in the Arroyos' position would have known enough information at this time to "prompt a deeper inquiry into a potential cause." Rather, the district court found that the Arroyos' claim accrued either on July 4, 2004 (the date that Mrs. Arroyo gave birth to her second son and, presumably, was given antibiotics prior to delivery), or within a few months of that date, when the Arroyos watched a lawyer's television commercial that stated that injuries such as Christian's are often due to physician malpractice.[1] The court found that, even if it assumed that the Arroyos' claim accrued on the earlier of these two dates, their suit would have been timely, given the FTCA's savings provision and the

---

[1] There is some uncertainty as to the exact date that the Arroyos' viewed the lawyer's television commercial. However, the district court determined, and it is apparently undisputed by both parties, that this event occurred roughly three months after the birth of the Arroyos' second son, sometime in October of 2004.

fact that the Arroyos filed a civil suit in state court in December of 2005.[2]

As discussed earlier, our precedents state that a plaintiff's knowledge of the non-governmental causes of his injury is insufficient to start the statute of limitations running on his FTCA claim. It is only when a plaintiff obtains sufficient knowledge of the government-related cause of his injury that his claim accrues. *See Drazan,* 762 F.2d at 59 (holding that the statute of limitations does not begin to run until the plaintiff discovers the "government link" in the causal chain); *see also Goodhand,* 40 F.3d at 212; *Nemmers,* 795 F.2d 629. Hence, the only issues before us are whether the district court erred when it determined the date that: (A) the Arroyos knew; or (B) a reasonable person in the Arroyos' position would have known enough to suspect, that actions taken by Christian's doctors contributed to his injuries.

The district court did not err in finding that the Arroyos did not actually know that there was a doctor-related cause until 2004. As stated earlier, the only information that the hospital conveyed to the Arroyos was that Christian's injuries were due to a blood infection that his mother had transmitted to him at birth. The fact that the Arroyos knew about the biological cause of Christian's injuries, however, does nothing to establish that the

---

[2] Both parties agree that the Arroyos filed their administrative claim while their state suit was pending and, hence, that the date of the commencement of the state suit is the operative date for statute of limitation purposes.

Arroyos knew that there was also a malpractice-related cause. The record is devoid of evidence establishing that the Arroyos knew that the hospital's doctors should have given Christian and his mother antibiotics, that Christian's infection was left untreated following his birth or that prompt treatment of his infection would have reduced or prevented the infection's damage. In short, the government failed to present *any* evidence establishing that, at the time of Christian's discharge, the Arroyos possessed knowledge that was sufficient to cause their claim to accrue.

We also find that the district court did not err in finding that a reasonably diligent person in the Arroyos' position in 2003 would have lacked information sufficient to prompt a deeper inquiry into whether Christian's doctors caused his injuries. In order to prevail on its statute of limitations defense, the government needed to show that a reasonable person, when informed that his or her infant's injuries were caused by an infection that had been transmitted during birth, would have searched for potential iatrogenic causes for the injuries. The United States did not meet this burden. First, the government failed to present any evidence establishing that injuries caused by birth-transmitted infections are typically caused by doctors. Second, and even more significantly, the government neglected to argue that iatrogenic causes are frequent enough that a reasonably diligent person would have investigated whether there was a doctor-related cause for Christian's injuries. While these omissions, on their own, provide more than sufficient grounds for affirming the district

court's decision, we also note that courts have found that it is reasonable for individuals presented with similar information about the etiology of birth-related injuries to assume that the hospital's staff did everything they could to prevent the injury. *See, e.g., Valdez ex rel. Donely v. United States*, 518 F.3d 173, 180 (2d Cir. 2008) ("When a doctor reports that a person is 'born with' a problem, it could reasonably have the effect of leading a person to believe that the injury was completely unavoidable."); *Rice v. United States*, 889 F. Supp. 1466, 1471 (N.D. Okl. 1995).

We reject the government's invitation to find that all reasonable persons who suffer injuries while under the care of medical professionals assume that their injuries can be attributed to shortcomings in the care they received.[3] This court has previously considered whether the law requires individuals to make this assumption and concluded that it does not, recognizing the "ghoulish consequence[s]" that would follow from adopting such a rule. *Drazan*, 762 F.2d at 59 (stating that such a rule would cause any individual who "suffered pain or illness . . . in a Veterans Administration hospital . . . [to]

---

[3] We note that the accrual rule proposed by the government has been endorsed by the Ninth Circuit in *Herrera-Diaz v. United States*, 845 F.2d 1534 (9th Cir. 1988), *Fernandez v. United States*, 673 F.2d 269 (9th Cir. 1982) and subsequent cases. A number of our sister circuits have joined us in rejecting this interpretation of *Kubrick. See, e.g., Hertz v. United States*, 560 F.3d 616, 619 (6th Cir. 2009); *Valdez v. United States*, 518 F.3d 173, 180 (2d Cir. 2008); *Green v. United States*, 180 Fed. App'x 310 (3d Cir. 2003).

request his hospital records to see whether diagnosis or treatment might have played a role in his distress," even if such an individual lacked any reason to think a doctor's actions contributed to his injuries); *see also Nemmers,* 795 F.2d at 631-32 ("[T]he statute of limitations should not be construed to compel everyone who knows of an injury to scour his medical records just in case the government's physician did something wrong."). As discussed above, our previous decisions establish that injuries can have multiple causes and that a plaintiff's claim only accrues when he obtains sufficient knowledge of the government-related cause of his injury.

The government has not presented us with reasons to abandon our prior holdings—its arguments resemble those we rejected in our earlier cases and it has not presented us with evidence discrediting our assumptions about what reasonable people assume when injured while in the care of doctor. Hence, we stand by our decisions in *Drazan* and *Nemmers.* A rule that forces patients to scour their records whenever they receive medical treatment and to initiate preemptive litigation is inequitable, inefficient and—most importantly—contrary to the commonsensical intuitions that "reasonable man" tests are supposed to embody.[4]

---

[4] The United States contends that rejecting its proposed rule will necessarily undermine the FTCA's statute of limitations and open the door to decades-old claims being filed against

(continued...)

 In its appeal, the government erroneously contends that the district court held that the Arroyos' claim did not accrue until they had enough information to suspect that the negligence of medical practitioners caused Christian's injuries. They further claim that the district court's holding renders the statute of limitations meaningless for claims such as the Arroyos', as it would mean that plaintiffs' claims would never accrue unless they knew that their injuries resulted from a negligent act. If the district court had analyzed the claim accrual issue in this manner, the government's arguments would, of course, be correct. However, as discussed above, we do not believe that the government's reading of the district court's opinion is plausible.

 In closing, we take a moment to clarify an issue that many have seemed to find confusing—the distinction between (1) injuries that have a doctor-related cause

---

(...continued)

the government. We reject this argument for several reasons. First, in the vast majority of situations, individuals who suffer an injury that is caused by the government—e.g., a broken leg due to being hit by a postal service vehicle—will immediately know of (or have reason to suspect) the governmental cause. Second, because of the claim accrual test's objective component, the government can establish that the statute of limitations started to run on a claim by showing that a reasonable person would have discovered the governmental cause at an earlier date, a showing that will typically become increasingly easy to make as more and more time passes from the time of injury.

and (2) injuries that are caused by a doctor's negligence. It is always the case that an injury that is caused by a doctor's negligence will have a doctor-related cause. The converse, however, is not true. There are many situations in which an individual's injury has a doctor-related cause, but is not the result of a doctor's negligence.[5] When determining the accrual date of a plaintiff's FTCA malpractice claim, courts must decide when the plaintiff knew enough (or should have known enough) to suspect that their injury had a doctor-related cause. *United States v. Kubrick,* 444 U.S. 111, 123 (1979); *Drazan,* 762 F.2d at 59. But, accrual does not wait until the plaintiff learns that their injury was caused by a doctor's negligence. *Kubrick,* 444 U.S. at 123.

## III. Conclusion

For the reasons stated above, the ruling of the district court is AFFIRMED.

---

[5] Consider the following example: A patient with a congenital heart defect undergoes open heart surgery. Despite the fact that the surgeon performing the operation does a superb job, abiding by all relevant standards of care, the patient suffers a stroke during the surgery. In such a situation, the patient's neurological injuries would have a doctor-related cause, but would not have been the result of negligence.

POSNER, *Circuit Judge*, concurring in the court's judg-ment and opinion. I join the court's opinion without reservations, and write separately only to raise two general questions about limitations periods in medical malpractice litigation (specifically litigation under the Federal Tort Claims Act) that while presented by this case do not have to be answered in order to decide it. Both relate to the discovery rule: the rule that fed-eral statutes of limitations don't begin to run until the prospective plaintiff discovers, or should have dis-covered, that he has been injured—and by whom. (See, with specific reference to medical malpractice suits under the tort claims act, *United States v. Kubrick*, 444 U.S. 111 (1979).) The first question is the role of the tort concept of the "reasonable person" in deciding whether the plaintiff "should have" discovered the injury and by whom it was inflicted. The second question is the relation of an ethical duty of candor by medical staff to the "should have" question.

As a practical matter what used to be called the "reason-able man" concept in tort law, now unsexed to conform to modern sensibilities, means the *average* person; this is in recognition of the fact that "when men live in society, a certain average of conduct, a sacrifice of individual peculiarities going beyond a certain point, is necessary to the general welfare . . . . The law con-siders, in other words, what would be blameworthy in the average man, the man of ordinary intelligence and prudence, and determines liability by that." O.W. Holmes, Jr., *The Common Law* 108 (1881); cf. *United States v. Slaight*, 620 F.3d 816, 821 (7th Cir. 2010); *Boim v. Holy Land Founda-*

*tion for Relief & Development*, 549 F.3d 685, 693 (7th Cir. 2008) (en banc); *United States v. Notorianni,* 729 F.2d 520, 522 (7th Cir. 1984). So negligence is failure to take the care that the average person would have taken in the defendant's position, and contributory or comparative negligence is failure to take the care that the average person in the plaintiff's position would have taken.

Prosser and Keeton call the reasonable person "a fictitious person, who never has existed on land or sea: the 'reasonable man of ordinary prudence' [is] . . . an ideal individual." W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 32, p. 174 (5th ed. 1984). But the key word is "ordinary": the required level of care has to be within the average person's ability to attain. Moreover, exceptions are allowed: a blind person is not held to the level of care of a sighted one. *Fletcher v. City of Aberdeen*, 338 P.2d 743, 745-46 (Wash. 1959); *Davis v. Feinstein*, 88 A.2d 695 (Pa. 1952); Richard A. Epstein, *Torts* § 5.10, p. 121 (1999); *Restatement (Third) of Torts: Liability for Physical and Emotional Harm* § 11(a) (2005); Holmes, *supra*, at 109. A blind person who, while using the blind person's white cane, is hit at an intersection, when a sighted person would easily have dodged the vehicle hurtling toward him driven by the defendant, is not deemed negligent if he was being as careful as it is reasonable to expect a blind person to be, bearing in mind the cost to the blind of holding them to the same standard of care in crossing streets as sighted persons. Otherwise a blind person would lose the protection of tort law when he ventured to cross a street.

The goal of the average-person rule (to give it the more perspicuous name), in instrumental terms, is to provide an additional incentive, beyond that of moral duty or concern with personal safety, to avoid injuring people (or being injured). A driver who falls below the average of care, and as a result injures someone, is subject to tort liability; it is hoped that the threat will motivate drivers to be careful to avoid injuring others (or themselves). Epstein, *supra*, § 5.2. Similarly, a pedestrian who falls below the average of care, and would not have been injured had he not done so, cannot obtain damages (full damages, and in some states—see, e.g., *Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 865 (7th Cir. 2010) (Virginia law)—any damages) even if his injurer also failed to exercise the care of an average person.

But this motivational system works only if potential injurers and potential victims are *capable* of exercising the care of the average person, or if incapable can at least avoid situations in which they are likely to cause or suffer injury. Drivers have to be licensed, and this excludes, in principle anyway, the least competent persons. And persons licensed to drive but nonetheless unskilled can avoid accidents by driving slowly or avoiding night driving and dangerous roads, or by not driving at all. Similarly, financially unsophisticated persons don't have to buy financial instruments, so all buyers of such instruments can properly be held to the standard of care of the average buyer. Moreover, if the law held unsophisticated buyers to only a lower standard, it would in effect be subsidizing them and thus encouraging the entry of financially unsophisticated persons into those markets.

"Care" thus connotes both the level of performance that the law requires and the set of compensatory measures that persons who are clumsy or inexperienced can use to attain a level of care that the average person attains with less effort. But a blind person, no matter how careful he tries to be, cannot cross a street as safely as a sighted person unless he can afford to hire an escort. Holding him to the standard of care of a sighted person would just discourage him from going out of his house, and this is thought an excessive cost (in contrast to forbidding blind people to drive); it "could lead to levels of social isolation that are no longer found acceptable." Epstein, *supra*, § 5.2, at 113.

True, there isn't an exception to the average-person standard for all types of person incapable of taking the care of the average person. There is not, for example, for the insane (beyond a narrow exception for a sudden, unforewarned insane fit, see *Breunig v. American Family Ins. Co.*, 173 N.W.2d 619, 624 (Wis. 1970)). The hope is that the family, or the authorities, will keep persons known to be insane out of mischief, *Restatement (Third) of Torts*, *supra*, § 11(c); and the incentive to do so will be somewhat greater if the insane person is held to the standard of the average person. Then too mental illness is more difficult to diagnose than blindness and its relation to the commission of a negligent act more difficult to determine.

There is no way in which holding the Arroyos, who seem to be typical clients of the Erie Family Health Center, to the level of medical knowledge of the average

person in American society could make them as knowledgeable as such a person. That would be almost as unrealistic as ruling that the statute of limitations in a medical malpractice suit begins to run whenever a patient who had been trained as a physician would have discovered that he had been injured as a result of a medical act or omission, though the actual plaintiff had no medical training. Which is not to say that contributory (or comparative) negligence has no role to play in medical malpractice cases. Drugs come with warnings; due care requires reading the warnings, provided they are intelligible to the average person. See, e.g., *Robinson v. McNeil Consumer Healthcare, supra*. Everyone knows one should read warning labels, though, like the plaintiff in the *Robinson* case, many do not.

   In applying the discovery rule, which governs when a federal claim accrues in the sense of starting the running of the period allowed by the statute of limitations for bringing suit, courts generally use the same average-person standard they use in determining negligence and contributory negligence. Compare *In re Signal Int'l, LLC*, 579 F.3d 478, 491-92 (5th Cir. 2009) (negligence), with *Nemmers v. United States*, 795 F.2d 628, 631 (7th Cir. 1986) (discovery in malpractice suit under Federal Tort Claims Act); *Valdez ex rel. Donely v. United States*, 518 F.3d 173, 177-78 (2d Cir. 2008) (same), and *Callahan v. United States*, 426 F.3d 444, 451 (1st Cir. 2005) (same); cf. *Fries v. Chicago & Northwestern Transportation Co.*, 909 F.2d 1092, 1095 (7th Cir. 1990) (discovery in other federal suits); *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009) (same). And typically they state the standard without

qualification. But such statements should be treated as generalities open to exception, in conformity with Holmes's overstated but illuminating observation that "general propositions do not decide concrete cases. The decision will depend on a judgment or intuition more subtle than any articulate major premise." *Lochner v. New York*, 198 U.S. 45, 76 (1905) (dissenting opinion). Judicial opinions would be unreadable if every proposition of law stated in them was embellished with every conceivable qualification necessary to make the proposition exactly and everywhere a true statement of the law. When judges recite the average-person rule of tort law, they do not bother to list its exceptions, such as the exceptions for blind people, other than ones that might be applicable to the case at hand. To omit to mention a qualification is not to reject it.

When knowing a fact depends on having technical knowledge, the incredible variance in such knowledge across American society can make the knowledge of the average person a perverse benchmark. Mrs. Arroyo had an infection (Group B Streptococcus), benign to her, when she entered the hospital to give birth. The birth seemed uneventful, but it was soon discovered that the infection had been communicated to her newborn during childbirth, causing the terrible injuries described in the court's opinion. Had she been a doctor, she would have suspected that the communication of her infection to the child during childbirth might have been preventable, and this suspicion in turn would have impelled her to investigate whether the failure of prevention had reflected a lack of due care and borne

a causal relation to the child's injuries. See Centers for Disease Control and Prevention, "Prevention of Perinatal Group B Streptococcal Disease," *Morbidity and Mortality Weekly Report*, Nov. 19, 2010, www.cdc.gov/mmwr/pdf/rr/rr5910.pdf. (visited July 26, 2011, as are the other web citations in this opinion). And similarly if her husband had been a doctor.

The Arroyos' baby was delivered at Northwestern Memorial Hospital by an obstetrician employed by the Erie Family Health Center in Chicago, and the baby's initial care was by a pediatrician also employed by the Center. The mother was a patient at Erie's West Town Health Center, which is located in a neighborhood that is 47 percent Hispanic. Erie's website explains that its goal is "to deliver quality health care to Chicago's medically underserved communities with compassion and respect." Erie Family Health Center, "About Erie," www.eriefamilyhealth.org/about-erie. Eighty-four percent of the Center's patients are Hispanic, 62 percent "are best served in Spanish," 34 percent are uninsured, and 86 percent "come from households with incomes that fall below the Federal Poverty Line." The Arroyos are Hispanic (Mrs. Arroyo does not speak English) and poor (her medical bills were paid for by "Public Aid"). Mr. Arroyo is a manual worker. Neither is college-educated.

As persons of limited education living we may assume at or near the poverty line, the Arroyos probably are deferential to medical staff. Told by the staff only that their child's injuries were the result of the

mother's infection, they could not have been expected to suspect that another cause was that the staff hadn't administered antibiotics to her, and to conduct research into the risk and prevention of the transmission of a deadly infection from mother to child during childbirth. Suppose that, contrary to the court's opinion, a person of average medical sophistication would have conducted an investigation that would have enabled suit to be filed before the statute of limitations expired. That should not defeat the Arroyos' claim. When the question in applying the discovery rule in a malpractice case is what knowledge should be ascribed to the plaintiff, the court should either determine the knowledge of the particular plaintiff or make a judgment applicable to the subset of the population that has approximately the same educational background and socioeconomic status as the plaintiff.

Granted, this approach would require, though only in cases in which the statute of limitations was pleaded as a defense, that plaintiffs present evidence about their educational background and socioeconomic status, in lieu of a guess by judge or jury, based on no evidence, of the medical sophistication of the average American. See, e.g., *Grand Trunk Ry. v. Ives*, 144 U.S. 408, 417 (1892); Leon Green, "The Negligence Issue," 37 *Yale L.J.* 1029 (1928). But why is that an objection rather than a confession that there is too much guesswork in American law and a clue that the traditional approach can produce absurd results when applied in a technical field—as in this case? For the government in its brief tells us—without references or other elaboration—that "from an objec-

tive standpoint, reasonably diligent persons are aware that infections can be prevented, particularly in hospital settings." On the contrary, knowledgeable persons, fearful of hospital-based infections—see R. Monina Klevens et al., "Estimating Health Care-Associated Infections and Deaths in U.S. Hospitals, 2002," 122 *Pub. Health Rep.* 160 (2007), www.ncbi.nlm.nih.gov/pmc/articles/PMC1820440; Andrew Pollack, "Rising Threat of Infections Unfazed by Antibiotics," *N.Y. Times*, Feb. 27, 2010, p. B1—strive to minimize the amount of time they spend in a hospital because they know, unlike the authors of the government's brief (if they believe what they wrote), that many infections in hospital settings *cannot* be prevented even with reasonable care. If "diligent" is a synonym for expert, as the government's brief implies, the government is not a diligent student of hospital infection. How can it demand that the Arroyos have a level of medical expertise that the Department of Justice appears to lack?

I need to make clear that I am discussing only the standard for determining when the statute of limitations begins to run, not the standard of care. *Kubrick* holds that the statute of limitations begins to run in a malpractice case when the plaintiff either discovers, or if diligent would have discovered, that he has been injured by the (at that point merely potential) defendant, and not when the plaintiff discovers or should have discovered that his injury was the result of negligence. This is not only the law; it is sensible. Even unsophisticated people, when they learn that they have been injured by a physician rather than (just) by the condi-

tion the physician was (or should have been) treating, should know that there may have been malpractice, and so should consult another physician, or other medical person, or a lawyer. Kubrick *knew* his injury might have been caused by a drug administered by the hospital; the question what level of sophistication should be assumed in deciding whether a patient *should know* that he has been injured by medical personnel was not before the Court. Weeks after being discharged from a Veterans Administration hospital in which he had been treated with an antibiotic called neomycin, Kubrick had "noticed a ringing sensation in his ears and some loss of hearing. An ear specialist . . . diagnosed the condition as bilateral nerve deafness. His diagnosis was confirmed by other specialists. One of them . . . secured Kubrick's VA hospital records and in January 1969, informed Kubrick that *it was highly possible that the hearing loss was the result of the neomycin treatment administered at the hospital.*" 444 U.S. at 113-14 (emphasis added). So, the Court held, that was when the statute of limitations began to run.

Had someone informed the Arroyos that it was "highly possible" that the injuries to their child had been caused by the failure to administer antibiotics to Mrs. Arroyo, the statute of limitations would have begun to run then, just as in *Kubrick*. For they would have known, or in the exercise of reasonable diligence (reasonably understood in light of their socioeconomic position) should have known, that a cause of their child's injuries might have been the failure of the doctors to administer antibiotics to Mrs. Arroyo; given that infor-

mation, they would or should have known enough to consult a lawyer or other expert. That may be asking a lot of them; but to ask that they have suspected malpractice in the absence of any disclosure of the possibility of an iatrogenic injury would be to ask too much.

I anticipate the objection that the suggested approach would nullify the statute of limitations in many medical malpractice cases. The Arroyos missed the two-year statutory deadline by seven months; they might have missed it by a greater margin but for the happenstance of seeing a tort lawyer's television commercial. The obvious answer would be to add a statute of repose to the Federal Tort Claims Act, as suggested in Kent Sinclair & Charles A. Szypszak, "Limitations of Action under the FTCA: A Synthesis and Proposal," 28 *Harv. J. Legis.* 1, 59-60 (1991), and, in a slightly different context, by Justice Stevens in *Kubrick*, 444 U.S. at 129 n. 5 (dissenting opinion). He was arguing that the statute of limitations should not begin to run until the plaintiff knew or should have known not only that he had been injured, but also that his injury was caused by the defendant's negligence—the argument the majority rejected. Statutes of repose are a common feature of medical malpractice law. See *Branch v. Willis-Knighton Medical Center*, 636 So. 2d 211 (La. 1994).

But if the Erie Family Health Center (or its backer, the United States) wants to avoid being hit by stale malpractice suits, it has only to level with patients (or in the case of a child, the patient's parents) concerning possible causes of a medical injury. When the Arroyos' child was discharged from the hospital with brain

injuries two months after his birth, the Center's physicians told the parents only that their child's injuries had been caused by an infection that Mrs. Arroyo had transmitted to him during his birth. They said nothing that might have alerted the Arroyos to the possibility that a medical act or omission had contributed to the infection. The physicians did not have to confess liability; indeed, at the trial the defense presented respectable evidence that there had been no negligence. All the Center would have had to do was give the Arroyos a reasonably full account of the circumstances of the child's injuries—that antibiotics could have been administered to the mother before the birth and to the child immediately after and that had this been done the injuries might have been averted, or been less serious. See *Nemmers v. United States, supra*, 795 F.2d at 631.

"According to recent codes and guidelines . . . individual clinicians and institutions have an ethical responsibility to disclose unanticipated negative outcomes. Respect for personal autonomy entails disclosure of what occurred—even if no further medical decisions are involved—and of options to take nonmedical actions, including legal actions, if appropriate." Tom L. Beauchamp & James F. Childress, *Principles of Biomedical Ethics* 294 (2009); see also American Medical Association, *Code of Medical Ethics: Current Opinions with Annotations* § 8.12, pp. 141-42 (1998). If a patient dies as a result of his physician's failure to diagnose a readily diagnosable, and if diagnosed readily curable, condition, such as appendicitis, it is a deceptive half-truth to tell the grieving spouse or parents that the patient died of appendicitis;

the patient's death was jointly caused by appendicitis and medical negligence. Compliance with the ethical duty of disclosure of possible medical errors in simple, intelligible terms would give medically unsophisticated plaintiffs enough information to recognize that medical decisions might have contributed to their injuries.

I am not arguing that a breach of the ethical duty of disclosure is itself malpractice, although it could be if it prevented the patient from obtaining medical treatment that would mitigate the consequences of the original medical error. I am not arguing that the disclosure must go beyond an acknowledgment of the *possibility* of medical error and become a confession that there *was* a medical error; or that a doctor is required to explain that additional treatment might have avoided the patient's injury if failure to provide that treatment would not have been negligent, because of the expense, side effects, or uncertain benefits of the treatment, as when a patient suffers an injury that would have been prevented had the doctor performed a battery of painful and expensive experimental tests. But if a potential defendant in a medical malpractice suit wants to take advantage of the statute of limitations he should have to disclose information known to him that would alert the patient to the possibility of an error. By doing that he can be sure that the statute of limitations will begin to run immediately (for that is what *Kubrick* holds) and not years later, though even without that precaution the statute of limitations might begin to run upon injury if the average member of the plaintiff's socioeconomic stratum would have realized that his injury might have

been caused by medical staff rather than by (or just by) an illness.

I want finally to distinguish this case from one in which concealment is pleaded to rebut a defense that the statute of limitations has expired. The doctrine of "fraudulent concealment," a form of equitable estoppel, tolls the statute of limitations during a period in which the defendant has taken steps to prevent the plaintiff from filing his complaint until the statute of limitations expires; he might for example have promised not to plead the statute of limitations while the parties were negotiating a possible settlement. *Wolin v. Smith Barney Inc.*, 83 F.3d 847, 850 (7th Cir. 1996); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990). "Fraudulent concealment in the law of limitations presupposes that the plaintiff has discovered, or, as required by the discovery rule, should have discovered, that the defendant injured him, and denotes efforts by the defendant—above and beyond the wrongdoing upon which the plaintiff's claim is founded—to prevent the plaintiff from suing in time." *Id.*; see also *Harrison v. United States*, 708 F.2d 1023, 1027-28 and n. 1 (5th Cir. 1983).

The Supreme Court has not decided whether the statute of limitations in suits under the Federal Tort Claims Act is jurisdictional and therefore (by analogy to such cases as *Bowles v. Russell*, 551 U.S. 205 (2007)) may not be tolled. Our court has not addressed the question either, and the courts of appeals that have done so are divided. Compare *Marley v. United States*, 567 F.3d 1030, 1034-37 (9th Cir. 2009), with *Santos ex rel. Beato v. United*

*States*, 559 F.3d 189, 194-97 (3d Cir. 2009), and *T.L. ex rel. Ingram v. United States*, 443 F.3d 956, 959-61 (8th Cir. 2006). There is no need to answer the question in this case, though I note the Supreme Court's recent remark that filing deadlines, even in suits against the government, are presumptively *not* jurisdictional. *Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct. 1197, 1203 (2011). The concealment in this case occurred before rather than after the statute of limitations began to run, because the concealment of the fact that the doctors had contributed to the child's injuries prevented the Arroyos from discovering the doctors' causal role. The statute of limitations does not begin to run until that discovery is made or should have been made by a reasonable person of the plaintiffs' educational and socioeconomic background. This is not a tolling case, so limitations on tolling are irrelevant.